Good morning, Your Honors. I'd like to reserve three minutes for rebuttal, please. May it please the Court, Laura Boudreau representing Aids Healthcare Foundation appellant. The first thing I'd like to emphasize in this case, Your Honor, is that this is a pleading case. The main essential question here is did Aids Healthcare Foundation, AHF, did its allegations state any plausible claim for relief? Boiled down, the key allegations that AHF made are the California legislature rushed through a statute, Welfare and Institutions Code 14105.46, in a budget crisis, purely to save money. That statute cuts Medicaid reimbursement to safety net providers like AHF. Can you pull the microphone a little closer? I can speak louder, too. I might be able to hear you a little better. Sorry. I can hear you, but it takes a bit of a strain. No problem. I apologize. So the allegations are that the California legislature rushed through the statute in a fiscal emergency. The statute cuts Medicaid reimbursement to safety net providers like AHF, that is providers who participate in the federal 340B drug pricing program. I know it is at the pleading stage, so obviously you get certain inferences in your favor, but can you identify other similarly situated entities that you contend receive a benefit that AHF does not? Sure. It would be all the pharmacies, for example, the retail pharmacies, who serve the same Medicaid population. So AHF has pharmacies. They're called safety net pharmacies because AHF is able to purchase through the 340B drug pricing program. But it serves the same Medicaid beneficiaries that a Walgreens or a CVS does. But what's happened with this statute is the state has said, we're going to take these group of safety net providers who have this access to the 340B program, and we're going to reimburse them less. So what you're saying at this stage, because it's pleadings, you have stated an equal protection because you're entitled to the inference. Now, at summary judgment, it could be a whole different thing, because they could put forth a rational basis of some sort that they haven't at this point. Is that what you're saying? That's correct, Your Honor. We're saying the allegations were sufficient to state an equal protection claim and also three other categories of claims as well. I think for purposes of oral argument, the simplest one to see is the claim number seven, which is that the state has not gotten CMS, that is the Center for Medicaid and Medicare Services, approval for this law to go into effect. This law changes the policy and methods. That's the language in the federal regs and statutes. It changes the policy and methods for setting reimbursement. What's supposed to happen by federal law is that change has to be put forth in a state plan amendment, which it was, and submitted to approval. The district court seemed to have decided that not so much on the macro concept, but it looks to me as if the district court said, well, your rates weren't reduced, that's the end of that, so you're not even in that ballgame because your rates weren't reduced, right? That's how it went off on its own. That's what the district court, that's how it said, you don't fall under the state plan amendment rules because it said what you are alleging is not a rate reduction. And as a matter of, if as a matter of law, or as you say, well, you don't have to do it directly, you can do it some other way, and you have reduced the rates, then at least the decision in that respect falls as far as the district court is concerned. Yes, that's exactly the same. They find another reason someday, but that one doesn't work, would be your argument? Well, right. Our argument is that in effect it is a rate reduction. The statute isn't called that, but it talks about a change of the policy on how these safety net providers are bused, billed, and get reimbursed, and that's a lesser amount. And at the end of the day, these providers are taking a rate cut. They're getting less money. And we know this because the State enacted the statute to save money. That was the purpose of the statute. So we know it's a, that's exactly what it is, whether they call it that or not. And it's the effect that matters, not the title of the statute. That's what the Oregon case cited in the brief stands for. So that same rationale, actually, is the rationale that explains why the third and fifth causes of action, which is about preemption by the Medicaid laws governing the provider reimbursement methods. It's the same rationale here. The district court said, well, it's not a change in reimbursement, it's not a rate reduction. So, therefore, the State doesn't have to comply with the Medicaid law that says reimbursements to providers must be consistent with quality of care and sufficient to enlist providers. As I just explained, it is a change. The standard of the statute is the State plan must include methods and procedures relating to payment. Well, this is a big change in method and procedures in how these providers are reimbursed. And what I would say to this is, on this cause of action, our allegations are on all fours with the Independent Living Centers decision, which is currently before the U.S. Supreme Court. Well, I want to ask you about that. I think for, can we decide this case without waiting for the Supreme Court's decision on the supremacy cause? It was just argued. I'm sure that you probably reviewed the argument. I don't know how. I tried to figure out how they're going to vote, but I'm not, I can't from the argument. But do we need to wait, or is that something that, because obviously standing is always an issue, and it can be a sua sponte issue. And I think at this point we would be assuming the standing there, but if we, if you prevailed on certain things at the pleading stage, is then that something that would just come up in the district court after that case? Because it could technically wipe you out. Well, let me say this. I agree with you. I read the transcript, and I can't tell which way they're going. They explored a whole bunch of, everything from full reversal to affirmance. Probably 5-4, but we just don't know 5. And even within the 5-4, what middle ground, they seem to be looking for something short of a full on reversal or affirmance. So I would, you don't, to answer your question, you don't need to hold for that case. Right now the controlling law is the independent living center decision, which says there is a cause of action under the supremacy clause. That's controlling. That's live. That wasn't taken off the books just because the Supreme Court granted review. So you don't have to wait. And, you know, if you were to decide that it controls remand and the Supreme Court were to hold otherwise, then, yes, it would be a matter that we would, I'm sure, would argue in the district court. I would say if independent living case does come down before this court issues its decision, I would just please, you know, beg to have an opportunity to brief that, because there are, it is not at all clear whether or how it will affect each of the different causes of action. For example, equal protection has nothing to do with supremacy clause. It has nothing to do with the issues that are independent living. So that should survive. With respect to the state plan amendment cause of action, number 7, there is case law in this circuit, district court case law, that recognizes that even if the supremacy clause action doesn't, cause of action doesn't work, the same allegations could support a 1983 cause of action. So even despite Sanchez and the holding there on the Medicaid law. So that case was the California Hospital Association case. So those allegations about the state plan amendment may survive independent living, even if the supremacy clause theory is rejected by the court. So these are just examples. They're just case-by-case issues we would want to break out. Likewise, the 340B preemption cause of action may not be touched by whatever independent living centers decide. We just don't know at this stage. So anyway, to summarize, no, I don't think you need to wait. But if it does come down while you are deciding, you know, if we could brief that issue, that would be important. Then the other area, the other claim that AHF brought that was dismissed by the court was the 340B preemption. AHF alleged that there's a federal scheme that is about the state's, created a program specifically designed to benefit safety net providers by giving them access to discount prices from drug manufacturers. That's a federal program that confers a federal status on players like us. The whole point is to stretch these federal dollars to make sure these safety net providers can go out and do what the federal government wants in terms of serving Medicaid, the indigent, these other people that would be on federal programs otherwise. But the federal government clearly doesn't want double billing. And what California says is we're just putting in a really nifty way of avoiding double billing. And there's nothing that keeps you from complying with our program and meeting the federal law also. Right? You can comply with ours. You won't be double billing, that's for darn sure. And you'll be meeting federal law. Yet you won't be double billing, but it will be interfering with the incentives and the mandate of the program. I mean, I would point out the program, the law itself says the Secretary of Health and Human Services shall create the mechanism to address this double discount problem. Yes, but that certainly doesn't mean that nobody else can. They better make sure that they have something in place to do that. Well, I don't know. We're talking about preemption. We're talking about Congress saying, no, we don't want states doing anything in this area. We'll take care of fraud ourselves. And if the state knows it's being, thinks it's being defrauded too bad, we'll take care of it ourselves. Well, but what's happening is, you know, as alleged, and I think happening in the real world, is as the states are insisting that these providers accept cost-based reimbursement on the Medicaid side and use 340B, what you're having is providers leaving the 340B program. And that's the risk. You're having providers say, if that's the case, we're going to give up our 340B status because we can't afford to accept the, I say cost-based, it's actually below-cost-based reimbursement under this program. So that's at odds with the whole purpose of the program, which is to serve this population. And you're having providers saying, we can't do this. We can't sustain this reimbursement. We'd rather give up the 340B benefit. The other thing I'll point out, Your Honor, on that point is I did not catch this in the opening briefs, but there is a portion of the statute as well in the 340B statute itself that was enacted as part of health care reform. It's the 4256, 42 U.S.C. 256B, subdivision D2B3, where it says, the Secretary shall develop more detailed guidance describing the methodologies and options available to covered entities for billing covered outpatient drugs to state Medicaid agencies in a manner that avoids duplicate discounts. It's further congressional language. It says, the Secretary shall do this. It's going to create the mechanism. And it says additional guidance, I think, because there's already clear guidance out there. Most clearly, I think, it excerpts a record, page 25, where you'll see the HRSA guidance that says, HRSA's the agency in charge of administering the 340B program. And they say, you know, HRSA says itself, at the outset, it's the decision of the covered entity to decide whether or not to use 340B purchased drugs when billing Medicaid. You're at three minutes, if you want to save any time. I do, Your Honor. So that's, I thank you.  Good morning, Your Honors. Good morning. May it please the Court, Deputy Attorney General Gayla E. Dunn, on behalf of the Department of Health Care Services. I would like to, the big elephant in the room is that, the ASTRA case. The ASTRA case came down after the district court's ruling. That case said unequivocally that covered entities have no private right of action under the 340B program. The appellant's entire case is based on their allegations that 256B, the 340B program, requires the ability to allow them to purchase drugs on the open market. Their entire case is based on 14105.46, which is directly applicable to 340B program participants. With that being said, Your Honors. Well, how does ASTRA knock out their equal protection charge at the pleading stage? Well, the statute is presumed valid. Appellants have pleaded basically implausible conclusory legal conclusions to negate the validity of the statute. The legislature does not have to articulate the reasons for its statute. It's presumed valid. However, the department did articulate its reasons. It's to simplify the drug rebate and the 340B duplicate discount problem. It does have a fiscal component, but just because it has a fiscal component does not mean that it is not valid. How do you do that at the pleading stage? That might, you might be successful at summary judgment, but how do you do that at the pleading stage if they can, they get all the inferences that they're being treated differently? Well, you could make an argument that you're being treated differently, but you have to have some reasons. In the case law where the courts have found that there was no rational basis, the government had not articulated any plausible reasons of their own to support their statute. That is not the case here, Your Honor. But there are two separate questions. You're answering the question, is there a reasonable basis for government to pass a statute that will protect the fisc? Sure. But that doesn't answer the question, is there a reasonable basis for government to pass a statute that says they're going to apply the statute, the statute applies to me, but it doesn't apply to anybody else in this room, because they're going to protect the fisc by taking money from my pocket and nobody else's. And that's the irrational, that's the equal protection argument they're making. I saw this in the briefs, too. It seems like the two of you are talking about different equal protection questions. You're saying, sure, the statute's right. We can give a rational basis for the statute. Sure. Can you give a rational basis for the distinctions? Yes. To answer your question, Your Honor, the first thing that I would like to point out is that appellants have not pled a plausible cause of action to show that they are similarly situated. They are 340B participants that receive deeply discounted drugs as participants in the 340B program. They are comparing themselves with non-340B program participants who do not take advantage of these, can't take advantage of these 340B discounted drugs. If that were the case, if they were to be similarly situated with the other providers, they would be purchasing on the open market and not entitled to the deeply discounted drugs. But what appellants are seeking is to be able to do both. They want to be similar to the providers who are not participants in the 340B program and also partake of those special advantages that they can get under the 340B program. Seems like a lot to resolve at the pleading stage. Well, Your Honor, I think that it's clear that they're not similarly situated. And if they are not, then they don't have an equal protection claim. And the equal protection analysis ends at that point. There is no equal protection violation. But at this stage, we're not supposed to be delving into factual determinations. It's supposed to be a determination on the pleadings. And what you're pointing us to are a set of facts that you claim are true and that they claim are not true. Well, no, the complaint, the appellant's own complaint demonstrates that they're not similarly situated. They allege that they are participants in the 340B program, that they're being treated differently from non- participants in the 340B program, and that they admit that they are able to get these deeply discounted drugs. That alone, those facts that are pleaded by the appellant show that they are not similarly situated. Sir, the Supreme Court case that was just argued this week, is there any reason that we need to wait for that? No, Your Honor, because this is not a rates case. This is a billing requirement of the 340B program. It does not change the rates in any way or fashion. What it does is to require 340B program participants to purchase 340B program drugs. It is if they are to bill the same amount that 340B program participants were billing for 340B discounted drugs for since the program started. In 1993, that requirement under 256B was the acquisition cost plus the dispensing fee. It is still the acquisition cost plus the dispensing fee. More than 11 years later, because it was first outlined in 1993, it was adopted in 2004, so at least 11 years they have formal notice that they are to bill acquisition cost plus dispensing fee for 340B drugs. Didn't the district court assume that they had a private cause of action under 14105.46 under the supremacy cause, and this Supreme Court case could find otherwise, so couldn't it ultimately be a factor? No, the district court did not find that. The district court found that there was no violation. This was not a rates case. This is what they said. It was not a rates reimbursement case. And that it did not affect 30A. The district court simply took it at that level, just that it doesn't matter what the law, anything else is. Exactly. If it is not a reimbursement rates case, 30A does not apply. And, Your Honor, I still do not see how they can get around 340B. I mean, the ASTRA case and the 256, because their entire case is based upon 256B. ASTRA was really involved with outlining to the court, they want the 340B program is a program, but it's a part of a much larger program. It involves the rebate, the drug rebate system as well. The government wants to be able to control these two programs so that they can have a uniform administration of both of these programs. If they had covered entities running in, filing lawsuits, they would, it would not be the system that they envisioned today. They could have adjudication of various lawsuits from different districts with different adjudications. Well, let's just assume, if Section 14105.46 indirectly changes reimbursement rates, even if it doesn't do so on its face, does that, does the federal, is there federal approval acquired under Oregon Association of Homes? No, Your Honor. I don't know if you're referring to the part where they had, you know, they had, you know, the nursing facility who was reclassified, or are you referring to the SPA approval? Well, if there's any change, don't you have to get a federal approval? No, Your Honor. If it's a change that affects reimbursement rates, it does. In Oregon, there were reimbursement rates that were applicable to a certain level of the nursing services. They moved those nursing services to another level they were, and then they applied reimbursement rates for that lower level. That was a direct reimbursement rate case. This is not the same thing. Appellants are not attacking the reimbursement rates. They're attacking the ability to purchase drugs on the open market. They're attacking 14105.46, not the reimbursement rates contained in 14105.46. 105.45, or the dispensing rates. So what I'm hearing you say, and maybe I'm not smart enough to figure it out, but what I'm hearing you say is that basically if you look at the Oregon case, that if you redraft the regulations that move people from a skilled nursing care level down to an intermediate nursing care level, you are in fact changing the rate of reimbursement by forcing people into a lower class of reimbursement. But in this case, nobody's being moved from one class or another. This just goes to their ability to purchase drugs at this discounted rate, and therefore that discounted rate, even though it may result in fewer dollars in the hands of these associations, doesn't matter. That's correct, Your Honor. As a matter of fact, this ability to purchase drugs on the open market that is the essence of this case, it still exists, but just not within the 340B program. It's a billing requirement. It is not a rate change. As a matter of fact, if the covered entity is not able to purchase a drug under the discount program, 14105 does allow them the ability in that instance to purchase drugs on the open market. But doesn't it indirectly change reimbursement rates, even if it doesn't do so on its face? No, it doesn't change reimbursement rates. It just changes the ability to purchase on the open market. So you actually get a different amount of money, but it doesn't change the reimbursement rate. Is your claim the rate's the same, but the amount of money you get is changed just because of the methodology? And somehow that indirect reduction in the amount of money you receive is unimportant? It doesn't matter? In this particular instance, because this is a big program, Your Honor, and the appellant is looking at it in a small sense of how much money that they can get out of the program, but the program involves so much more. They have the option to be in the program, receive these discounted drugs. They cannot have their cake and eat it, too. They cannot become a program participant in order to take advantage of it. It seems like there's a little less cake to eat, you know. Well, then they have the option at that point to go on the open market and purchase drugs there if they're able to maximize their profit in that way. But they want to stay in the program. There is apparently some benefit. It is not in all instances that they are receiving less money for the purchase of these drugs. That's why they want to do their program when it maximizes their profit, jump out and purchase on the open market when it fits them as well. And that's not what the program requires. The program, the 340B program, is to allow discounted drugs to the covered entities at a discount. And in that respect, 14105.6 fulfills that ability. They are entitled to the discount, the drugs at a discount. I would also like to address briefly the preemption claim. All right. You're down to like your last 30 seconds, so. 256B, there is no federal requirement that requires these entities to be allowed the ability to purchase on the open market. Therefore, there can be no preemption because there is no federal statute. There's no violation. If it's not a rates case, 30A is not applicable, and there is no preemption in that respect either, Your Honors. In essence, the district court did not abuse its discretion when it granted the department's motion to dismiss, nor did, well, it didn't when it granted the motion to dismiss without leave to amend because it would have been futile to do so. They cannot state a plausible cause of action. All right. Thank you for your argument. Your Honors, just to touch on a few points quickly. What I heard in that dialogue, that back and forth about whether it's a rate reduction, not a rate reduction, what I heard was a whole dialogue about factual questions. That's our whole point. We say this statute results in less dollars in the safety provider's pockets. That's it. They say it doesn't. That's a dispute. That's a disputed fact. It doesn't belong here at this pleading stage. I would say, though, to the extent the court is going to go into the merits on this, if the court could just look at the big picture, what this is all about is CMS wants to know when the State is tinkering with provider rates. That's the whole point of requiring the amendment. That's the whole point of the statute that says the State has to hit these substantive procedural requirements if it's going to change rates. So CMS isn't concerned about whether it's called a rate reduction or not. What it cares about is the Medicaid program. Is the Medicaid program, is there integrity to it? Is the State paying enough so that providers can participate in this program and beneficiaries have access to care? That's what this is about. This statute interferes with that because it's making it harder for State safety net providers to participate in this program. That's the point, and that's why this the State statute is preempted and needs to be included and approved in a State plan amendment. As far as the ASTRA decision goes, I urge the Court to read that. It has nothing to do with this case. That has to do with whether 340B providers had a right of action under a contract theory. As third party But do you agree that ASTRA means that 340B entities do not have a private right of action to challenge 340B reimbursement rates? I do not. It was about whether they had standing to challenge the third-party beneficiary to the contract between the Federal Government and the drug manufacturers. They were saying the reimbursements were not the they were saying the prices were incorrect. They had an issue the 340B had an issue with the pricing and how that contract was being administered between the 340B between the I'm sorry the drug manufacturers and the government. And the 340B entities had a beef, frankly, with that. They said we're not getting the right pricing here. It's not flowing down to us. It was totally a contract theory. It had nothing to do with a supremacy clause, nothing to do with the issues here. Well, did the Court find they had a private right of action? It found it did not under a contract third-party beneficiary theory. So I don't understand what you're trying to put a different spin on ASTRA, but it surely still seems to mean that 340B entities do not have a private right of action to challenge the 340B reimbursement rates. But that's exactly what the current independent living case is about. What they did is they said you may not have an action for damages under a contract theory or some other theory, but you do have an equitable cause of action under a preemption theory under the supremacy clause. That's the whole point of the independent living center case is to see whether that is correct or not. That's the Ninth Circuit ruling. The U.S. Supreme Court is considering that now. All right. Your time is concluded. Thank you both for your argument. This matter will stand submitted. Thank you very much, Laura. Thank you. Next matter on calendar is Developmental Services Network v. David Maxwell Jolly, cases 11-55851 and 11-55852.
judges: Erickson, Fernandez, Callahan